UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JILL BURNELL, et al.,

           Plaintiffs,

    v.

MARIN HUMANE SOCIETY, et al.,

           Defendants.

Case No.  14-cv-05635-JSC

**ORDER RE:  MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT**

Re: Dkt. Nos. 47, 49, 50

      This action arises out of the Marin Humane Society's seizure of four horses from the property of Plaintiffs Jill and Alex Burnell ("Jill" and "Alex" and together "Plaintiffs") in December 2012 and January 2013 on the grounds that the animals were either severely malnourished or otherwise unhealthy.  In the First Amended Complaint ("FAC"), Plaintiffs bring suit against the Marin Humane Society, Marin County (the "County"), and a number of individual Defendants, including: the Marin Humane Society's CEO, four Marin Humane Society employees who act as humane officers, a member of the Marin Humane Society's board of directors who also serves as its authorized spokesperson, a veterinarian whose clients include Plaintiffs and the Marin Humane Society, two individuals who reported Jill Burnell to the Marin Humane Society, and Albert Burnham ("Burnham") the individual appointed as county hearing officer in administrative proceedings related to the seizure of the horses.  (Dkt. No. 46.)  Plaintiffs bring one count against all Defendants under 42 U.S.C. § 1983; the six other counts against various groupings of Defendants arise under state tort law, including trespass upon land, trespass to chattels, conversion, portraying Plaintiffs in a false light, public disclosure of private facts and invasion of Plaintiffs' constitutional right to privacy, and intentional and/or negligent infliction of emotional distress.  (*Id.*)  The Court earlier dismissed the initial complaint finding that Plaintiffs failed to

state a Section 1983 claim against any defendant and dismissed the claims against Burnham with prejudice on grounds of judicial immunity. *Burnell v. Marin Humane Soc'y*, No. 14-cv-05635-JSC, 2015 WL 4089844, at *2, 4 (N.D. Cal. July 6, 2015).

Now pending before the Court are Defendants' motions to dismiss, or in the alternative, to stay this case in favor of a pending state action; as with briefing regarding the initial complaint, the Marin Humane Society and all individual defendants filed one motion (referred to here as "Defendants' Motion"), and the County filed separately (the "County's Motion"). (Dkt. Nos. 47, 50.) Defendants contend that the FAC fails to cure the defects the Court identified in Plaintiffs' pleading and should be dismissed with prejudice. In addition, Burnham has moved for entry of judgment in his favor. (Dkt. No. 49.) Having considered the parties' submissions, and having had the benefit of oral argument on October 8, 2015, the Court rules as follows.

## BACKGROUND

**A.     Statutory and Regulatory Framework**

Before discussing the facts, an explanation of certain state laws and local regulations and ordinances regarding animal control and enforcing animal control regulations is helpful.

California Penal Code Section 597.1 makes it a misdemeanor for an animal owner to fail to provide proper care and attention to an animal and provides that when "a peace officer, humane society officer, or animal control officer" has "reasonable grounds to believe that very prompt action is required to protect the health or safety of [an] animal . . . the officer shall immediately seize the animal and comply with subdivision (f)." The "reasonable grounds to believe that very prompt action is required" is the equivalent of the exigent circumstances exception familiar to search and seizure law" that allows officers to act in "an emergency situation requiring swift action to save life, property, or evidence." *Broden v. Marin Humane Soc'y*, 70 Cal. App. 4th 1212, 1221 (1999). Subdivision (f), in turn, requires an administrative hearing regarding the proprietary of the animal seizure. Cal. Penal Code § 597.1(f).

Under California law, even absent such agreement, the Marin Humane Society is empowered to "enforce the provisions of laws of this state for the prevention of cruelty to animals, or arresting or prosecuting offenders thereunder, or preventing cruelty to animals." Cal. Corp.

1    Code. § 14501.

2          The County entered a contract with the Marin Humane Society, a private 501(c)(3) non-

3    profit organization that promotes animal rights, for the Marin Humane Society to provide animal-

4    related services. (*Id.* ¶¶ 6, 9.) Specifically, the County has designated the Marin Humane Society

5    as the "animal services agency" for the county, responsible for enforcing all state and local laws

6    relating to the care, treatment, and impounding of animals, including issuing citations and making

7    arrests, and vested in the Marin Humane Society authority to appoint suitable persons to act as

8    animal service officers, who are deemed to be peace officers for the purpose of enforcing County

9    animal control ordinances. Marin Muni. Code §§ 8.04.010, 8.04.110, 8.04.120. Defendants

10   McKenney, Machado, Hill and Rogers were all Marin Humane Society employees during the

11   relevant time period. (Dkt. No. 46 ¶¶ 13-17.)

12   **B.      Factual Background**

13         The following facts are taken from the FAC and documents of which the Court takes

14   judicial notice.[1] Plaintiffs are a married couple who live in a trailer on a 35-acre parcel of

15   _____

16   [1] Pursuant to Federal Rule of Evidence 201, the Court "may judicially notice a fact that is not
     subject to reasonable dispute because it: (i) is generally known within the trial court's territorial
17   jurisdiction; or (ii) can be accurately and readily determined from sources whose accuracy cannot
     reasonably be questioned." Judicial notice is appropriate for "materials incorporated into the
18   complaint or matters of public record[,]" *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th
     Cir. 2010). Here, Defendants request that the Court take judicial notice of Exhibits A-F. (Dkt.
19   No. 48.) All of these documents are publicly filed documents from state court proceedings
     involving Plaintiffs, including the county-initiated administrative proceedings regarding the
20   seizure of the horses, criminal proceedings against Plaintiffs regarding their care of the horses, and
     civil cases that Plaintiffs and others brought pertaining to the horses. All of these documents "can
21   be accurately and readily determined from sources whose accuracy cannot reasonably be
     questioned." Fed. R. Evid. 201. And indeed, it is well established that a court may take judicial
22   notice of records from other court proceedings, *McMcMunigal v. Bloch*, No. C 1002765 SI, 2010
     WL 5399219, at *2 (N.D. Cal. Dec. 23, 2010), including state judicial and administrative
23   proceedings in particular. *Mack v. So. Bay Beer Distribs.*, 798 F.2d 1279, 1282 (9th Cir. 1986),
     *abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991);
24   *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo*, 971 F.2d 244, 248 (9th Cir. 1992);
     *United States v. Epperson*, 528 F.2d 48, 50 (9th Cir. 1975) (affirming district court's decision to
25   take judicial notice of an individual's guilty plea). Of course, the court does not credit the truth of
     the facts or allegations set forth therein, but rather "only for the purposes of noticing the existence
26   of the [prior] lawsuit[s], the claims made in the lawsuit[s], and the fact that various documents
     were filed therein." *McMunigal*, 2010 WL 5399219, at *2 (citation omitted). Plaintiffs did not
27   file a request for judicial notice but attached several documents to their opposition to the County's
     motion to dismiss. (*See* Dkt. Nos. 54-1—54-4.) Despite the absence of a request for judicial
28   notice, the Court will take notice of Exhibit B (Dkt. No. 54-2), portions of the Marin County
     Municipal Code. *See Engine Mfrs. Ass'n v. So. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031,

agricultural land they own in Marin County, California (the "Chileno Valley Road property").
(Dkt. No. ¶¶ 1-2.)  Jill works as a livestock breeder of horses for the equestrian discipline known
as "Hunters."  (*Id.* ¶ 3.)  By December 2012, she owned over 35 horses—including stallions,
broodmares, and their offspring—at the Chileno Valley Road property.  (*Id.* ¶ 3.)  The property,
which is not visible from a public road, is fenced-in meadowland with a water well and electronic
pump.  (*Id.* ¶ 2.)  In October 2012, Plaintiffs added internal pasture fencing, three walk-in sun
shelters, wind breaks, stallion paddocks, and storage buildings for feed and equipment.  (*Id.* ¶ 2.)
Of Jill's 35 horses living at the Chileno Valley Road property, breeding stallion Romantic Star and
broodmares Devil's Sis (also known as Pookie) and Metsonized (also known as Nutsie)—whom
Alex considered his pet—were particularly valuable.  (*Id.*)  Jill also had an established,
economically advantageous client relationship with the owner of broodmare Lucky Karma.  (*Id.*)
Plaintiffs' complaint details Defendants' interference with these four horses.

        *Initial Investigation*

        In October 2012, Ricci made false reports to Rogers at the Marin Humane Society about
the care and condition of the Plaintiffs' horses.  (*Id.* ¶ 22.)  Specifically, Ricci told Rogers—who
at some point unsuccessfully tried to sell a horse to Jill (*id.* ¶ 17)—that Plaintiffs had moved their
40 to 50 breeding horses to Marin County without adequate food or shelter.  (*Id.* ¶¶ 22, 35.)  Ricci
made these claims "for the purpose of redistributing [Plaintiffs'] horses to others."  (*Id.*)  Based

---

1039 n.2 (9th Cir. 2007) ("Municipal ordinances are proper subjects for judicial notice.") (citation
omitted).  The Court will not judicially notice Exhibits C and D (Dkt. Nos. 54-3, 54-5), which are
the declaration and testimony of Marin Humane Society Captain Cindy Machado in earlier
proceedings, as the contents of a declaration or a deposition are not clearly established  "facts" and
therefore are inappropriate for judicial notice.  *See in re Oracle Corp Sec. Litig.*, 627 F.3d 376,
386 n.1 (9th Cir. 2010).  Finally, in connection with Plaintiffs' supplemental opposition, they
submitted a request for judicial notice of three documents; the request itself cites no authority for
the propriety of judicial notice of any of the documents.  (Dkt. No. 66.)  The first is a Roster of
Public Agencies for Marin County stamped with the county seal.  (Dkt. No. 66-1.)  The document
is undated, despite Plaintiffs' assertion that it is from April 19, 2013.  (Dkt. No. 66 ¶ 1.)  The
Court declines to take judicial notice of this document.  Similarly, the second document is an April
18, 2014 statement by McKenney, the Marin Humane Society's CEO, explaining the agency's
seizure of Plaintiffs' horses.  (Dkt. No. 66-2.)  The Court will not take judicial notice of this
document, which is evidentiary in nature.  But the Court will judicially notice the third document,
the hearing officer's Order on Scope of Hearing in the second round of administrative hearings.
(Dkt. No. 66-3.)  As above, the Court takes judicial notice only of the fact that the document was
filed in the administrative proceeding.  *See McMunigal*, 2010 WL 5399219, at *2.

on Ricci's reports, the Marin Humane Society opened an investigation into Plaintiffs' horses. (*Id.* ¶ 22.) As part of that investigation, Rogers, Machado, and Hill met to discuss Plaintiffs twice weekly. (*Id.* ¶ 35.) Rogers and Machado then recruited Plaintiffs' neighbors to surveil Plaintiffs and report all vehicles and visitors to the property—in part, to harass and intimidate these visitors, including clients, veterinarians, and farriers caring for the horses—and to allow the Marin Humane Society access to their land to surveil Plaintiffs. (*Id.* ¶¶ 35-36.)

In November, as the investigation continued, Rogers began posting information about Plaintiffs and her "case" against them on the internet, including on a bulletin board called the Chronicle of the Horse. (*Id.* ¶¶ 36-37.) Rogers announced that she would assist any individuals with business claims against Plaintiffs, that Jill had refused to speak with her, and that Plaintiffs' horses were without shelter at the Chileno Valley Road Property. (*Id.* ¶ 37.) Over the course of the investigation, Rogers and Hill published photos of holes in Plaintiffs' property contending, untruthfully, that the holes were used to hide human waste in violation of county zoning regulations. (*Id.* ¶ 18.) Rogers misreported to Plaintiffs' vendors that Plaintiffs were prohibited from purchasing horse feed supplies and had poor credit. (*Id.*) Rogers reported that Plaintiffs' horses were stripping trees on the property to feed themselves because they did not have adequate feed, when really the trees were trimmed to shelter the horses and the horses were in good health, not starving. (*Id.*) As a result of these internet postings, Jill's breeding business was declining. (*Id.* ¶ 38.) Rogers intent in spearheading this investigation was to redistribute Plaintiffs' horses to individuals whom Rogers believed would be better guardians of the animals. (*Id.* ¶ 37.)

The Marin Humane Society used the investigation against Jill to promote private fundraising for its animal rights activities. (*Id.* ¶ 10.) Plaintiffs contend that the Marin Humane Society has a policy and practice of making false and reckless statements in order to create a pretext to seize animals from private persons. (*Id.*)

On December 18, 2012, Jill sold the stallion Romantic Star to a Georgia breeder for $100,000. (*Id.* ¶ 38.) Plaintiffs intended to use the money to improve the Chileno Valley Road Property. (*Id.*) That same day, Rogers surveilled Plaintiffs' property from a neighbor's. (*Id.*) Rogers waved Jill over, but she did not approach. (*Id.*) Rogers posted a "Notice of Correction" on

United States District Court
Northern District of California

5

Plaintiffs' fence, instructing Jill to contact the Marin Humane Society regarding inadequate shelter and thin, lame horses.  (*Id.*)  That day, Jill called Hill at the Marin Humane Society to complain about Rogers' internet activity.  (*Id.*)  Hill responded that he would come out to the Chileno Valley Road property on December 28 to speak with her.  (*Id.*)

On December 19, 2012, veterinarian Paul McEvoy visited the Chileno Valley Road Property and examined Romantic Star to prepare the stallion for transportation to Georgia pursuant to the sale.  (*Id.* ¶ 39.)  Dr. McEvoy found nothing amiss with Plaintiffs' horses.  (*Id.*)

*The Seizures*

On December 26, 2012, two of Plaintiffs' stallions fought, including Romantic Star.  (*Id.* ¶ 40.)  Within two hours of the fight, veterinarian Steve Wood came to the property to treat the horses.  (*Id.*)  Romantic Star's Georgia purchaser requested that Dr. McEvoy conduct a follow-up examination of the stallion in light of the fight, and arrangements were made.  (*Id.*)

Early the next morning, Ricci emailed Rogers describing the events of the following evening, reporting that two of the horses entered the same pen and fought, and that Dr. Wood was visiting the horses.  (*Id.* ¶ 41.)  Ricci learned that information from Ghilotti.  (*Id.* ¶ 41 n.4.)  At 11:20 a.m., the Marin Humane Society sent a team—including Rogers, Hill, and veterinarian Dr. Keefer—to Plaintiffs' property along with a Sheriff's Deputy to remove the horses "on the pretext that mortally wounded horses had not received medical care after the stallion fight and were in life threatening, emergency condition."  (*Id.*)

At 4 p.m. that day, without seeking judicial consent, the Marin Humane Society seized two horses: Romantic Star and Devil's Sis.  (*Id.* ¶¶ 41-44.)  Romantic Star was muddied and bruised, but medically stable and secured in his paddock.  (*Id.* ¶¶ 44, 48.)  Devil's Sis was thin having recently weaned a foal, but not starving.  (*Id.*)  Both horses were standing and moving normally, could eat food, were provided food and water, had the benefit of shelter from their naturally hairy coats.  (*Id.* ¶ 45.)  Devil's Sis was also wearing a horse blanket.  (*Id.*)  Feed was present on the property for the horses.  (*Id.* ¶ 47.)  Horses' weight typically fluctuates seasonally.  (*Id.* ¶ 46.)

The next day, the Marin Humane Society published an appeal for public donations to care for the "Burnell horses" and raised over $50,000.  (*Id.* ¶ 50.)  On January 4, 2013, Rogers, Hill and

United States District Court
Northern District of California

1    Machado returned to Plaintiffs' property with another Sheriff's deputy and searched the property

2    and horses.  (*Id.* ¶ 53.)  They seized two more horses: Metsonized and Lucky Karma.  (*Id.* ¶ 53.)

3    Both horses could stand, walk, eat, and socialize, and had hairy coats to protect them from the

4    elements.  (*Id.* ¶ 53.)  In other words, there was no emergency warranting their removal.  (*Id.*)

5            *Seizure Aftermath*

6            On January 17, 2013, the Marin Humane Society and Wagman demanded that Plaintiffs

7    pay $8,846.36 for fees incurred in the care of Romantic Star and Devil's Sis to date, including

8    impound fees, trailering fees, daily boarding costs, and veterinary bills.  (*Id.* ¶ 58.)  They

9    demanded that if charges were not paid, the horses would be deemed abandoned and become the

10   property of the Marin Humane Society.  (*Id.*)  They also warned that Plaintiffs would be

11   responsible for further costs moving forward.  (*Id.*)  Similarly, on February 4, 2013 the Marin

12   Humane Society and Wagman demanded that Plaintiffs pay $6,211.15 for fees associated with the

13   seizure and care of Lucky Karma and Metsonized.  (*Id.* ¶ 59.)

14           On February 4, 2013, the Georgia breeder who purchased Romantic Star sued the Marin

15   Humane Society for conversion.  (*Id.* ¶ 60.)  The Marin Humane Society and Wagman then

16   demanded $4,727.10 from her for costs incurred in the seizure and care of Romantic Star.  (*Id.*

17   ¶ 61.)  That lien was paid.  (*Id.* ¶ 63.)

18           As a result of the actions described above, Jill's breeding business is no longer profitable.

19   (*Id.* ¶ 4.)

20   **C.    Procedural History**

21           *State Court Proceedings*

22           On February 8, 2013, Machado made a criminal referral to the Marin County District

23   Attorney's Office requesting criminal prosecution of both Plaintiffs.  (*Id.* ¶ 61.)  The referral

24   contained false statements including: that Plaintiffs denied having horses on the property, that the

25   horses were without shelter, that the seized horses needed immediate veterinary care not provided.

26   (*Id.* ¶ 62.)  In December 2013 the felony allegations against both Plaintiffs were reduced to

27   misdemeanors.  (*Id.* ¶ 68.)  In May 2014, Jill pleaded guilty to a single misdemeanor charge of

28   failure to provide an animal with proper shelter or protection from the weather in violation of

United States District Court
Northern District of California

7

1    California Penal Code § 597(b) and was sentenced to a four-year term of supervisory probation

2    that included continued monitoring by the Marin Humane Society.[2]  (Dkt. No. 48-2 at 4-5.)

3         Pursuant to Cal Penal Code Section 597(f), on January 8 and January 24, 2013, the County

4    held administrative hearings regarding the lawfulness of the seizures.  (Dkt. No. 46 ¶ 20.)  *See also*

5    *Burnell v. Marin Humane Soc'y*, Nos. A140246, A140247, 2014 WL 5035723, at *2 (Cal. Ct.

6    App. Oct. 9, 2014) ("*Burnell Writ Review*") (describing the administrative hearings).  Also on

7    January 8, 2013, Jill filed an Ex Parte Writ of Mandate Compelling Return of Improperly Seized

8    Animals in Marin County Superior Court, but the writ was summarily denied based on the judge's

9    conclusion that "this case is not an appropriate matter for this court."  (Dkt. No. 48-3 at 3.)

10   Ultimately, the hearing officer, Burnham, upheld the seizures as lawful.  (Dkt. No. 46 ¶ 20.)  *See*

11   *Burnell Writ Review*, 2014 WL 503824, at *2-3.

12        At some point thereafter, Jill brought a civil action in Marin County Superior Court against

13   the Marin Humane Society for conversion, but the court stayed that suit pending resolution of the

14   administrative proceedings under Section 597.1, including appeal.  (Dkt. No. 48-4.)  And in fact,

15   Plaintiff appealed the hearing officer's administrative decision by filing a petition for writ of

16   mandate in Marin County Superior Court, which found the seizures not justified and the

17   administrative hearing defective due to the manner in which the hearing officer was selected.

18   (Dkt. No. 46 ¶¶ 64-65.)  The Marin Humane Society appealed, and the California Court of Appeal

19   reversed the Superior Court's order finding the seizures unlawful; the Court of Appeal, however,

20   agreed that the hearings were defective due to the hearing officer selection and therefore instructed

21   the trial court to remand the matter for new administrative hearings.  *Burnell Writ Review*, 2014

22   WL 503824, at *3.

23        In late March 2015, a new round of Section 597.1(f) administrative hearings was held

24   before a new hearing officer pursuant to the Court of Appeal's order.  (Dkt. No. 46 ¶ 71.)  Both

25   parties presented evidence, called witnesses, submitted proposed findings of fact and conclusions

26

27   [2] While Plaintiffs alleged that the plea agreement required the Marin Humane Society to refrain
     from public comment about the case or to surveil Plaintiffs' property without a neutral veterinarian
28   present, this allegation conflicts with the language of the plea agreement Jill signed.  (*Compare*
     Dkt. No. 46 ¶ 69, *with* Dkt. No. 48-5 at 3.)  The Court therefore does not credit the allegations.

United States District Court
Northern District of California

of law and had the opportunity to submit post-hearing briefs.  (*See* Dkt. No. 48-5 ¶ 1.)  On May 15, 2015, the hearing officer issued a written decision finding the seizures of Plaintiffs' horses lawful.  (*Id.* at 39-40.)  Plaintiffs have since filed a petition for writ of mandate in Marin County Superior Court challenging the hearing officer's May 2015 decision.  (Dkt. No. 48-6.)

   *The Instant Federal Action*

   Plaintiffs initiated this action in federal court on December 26, 2014.  (Dkt. No. 1.)  The Court dismissed the initial complaint for failure to state a claim.  The Court addressed only the Section 1983 claim—noting that, without it, the Court would be hesitant to exercise supplemental jurisdiction over the other six state law claims—and noted that Plaintiffs "neither identif[y] the constitutional right at issue nor each defendant's role in the alleged violation," so the complaint failed to state a Section 1983 claim.  *Burnell*, 2015 WL 4089844, at *3.  The Court granted Plaintiffs leave to amend to "clarify which constitutional rights each defendant violated" and to include facts that explained each defendant's role.  *Id.*

   Plaintiffs' FAC followed, which bring the same seven causes of action: a Section 1983 claim by both Plaintiffs against all Defendants, and six tort claims arising out of state law against various groupings of Defendants.  Defendants moved to dismiss the FAC, contending that Plaintiffs have failed to cure the defects the Court identified in its Order dismissing the initial complaint for failure to state a claim.  (Dkt. No. 47.)  The Court allowed the parties to file supplemental briefing on this motion.[3]  (Dkt. No. 64.)  The County filed a separate motion to dismiss, urging that the FAC fails to state a *Monell* claim under Section 1983 against the County.  (Dkt. No. 50.)  In addition, Defendant Burnham—who was dismissed from the complaint with prejudice—has filed a motion for entry of judgment pursuant to Rule 54.  (Dkt. No. 49.)   The Court heard oral argument on October 8, 2015.

---

[3] Specifically, the Court permitted supplemental briefing because Plaintiffs reportedly did not have access to the unpublished cases that Defendants cited in their motion.  Defendants graciously provided copies of the authorities on which they relied to Plaintiffs shortly after Plaintiffs raised this concern, but the Court permitted supplemental briefing to allow Plaintiffs to distinguish or otherwise respond to these cases.

United States District Court
Northern District of California

**DISCUSSION**

**I.      Burnham's Motion for Entry of Final Judgment (Dkt. No. 49)**

In reviewing the initial complaint, the Court dismissed with prejudice all claims against Burnham, who was sued in his capacity as administrative hearing officer who oversaw the first round of administrative proceedings into the propriety of the Marin Humane Society's seizure of Jill Burnell's horses.  "It is well established that state judges are entitled to absolute immunity for their judicial acts." *Swift v. State of Cal.*, 384 F.3d 1184, 1188 (9th Cir. 2004) (citation omitted). "Courts have extended absolute judicial immunity from damage actions under 42 U.S.C. § 1983 not only to judges but also to officers whose functions bear a close association to the judicial process[,]" including "hearing officers and administrative law judges" when they are performing adjudicative functions. *Demoran v. Witt*, 781 F.2d 155, 156 (9th Cir. 1985) (footnote omitted). The Court noted that Plaintiffs' allegations about Burnham all arise out of his capacity as administrative hearing officer, including that he should have disclosed that he was not qualified to serve in this position.  The Court therefore dismissed with prejudice all claims against Burnham. Nevertheless, Plaintiffs name Burnham as a defendant in the FAC and continue to allege that his role as hearing officer violated Plaintiffs' constitutional rights.  (*See* Dkt. No. 46 at 1 & ¶ 20; *see also id.* ¶ 20 n.22 (noting that "Burnham was dismissed with prejudice from this action on a finding of judicial immunity").)  These claims have already been dismissed with prejudice.  To clarify, this means Plaintiffs cannot bring claims against Burnham in any amended complaint.

Because the Court already dismissed all claims against Burnham with prejudice but Plaintiffs still appeared to renew their claims against him in the FAC, Burnham moves for entry of final judgment in his favor pursuant to Federal Rule of Civil Procedure 54(b).  (Dkt. No. 49.) Rule 54(b) allows a court to direct entry of final judgment for the purpose of appeal as to one or more, but fewer than all, claims or defendants if the Court expressly determines that there is no just reason for delay.  Fed. R. Civ. P. 54(b).  First, the Court must determine whether it is dealing with a final judgment.  *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980).  Second, the Court must determine whether there is any just reason for delay, "tak[ing] into account judicial administrative interests as well as the equities involved."  *Id.* at 8.  To determine if there is any just

10

1   reason for delay, "[a] district court may consider factors such as whether the claims under review

2   were separable from the others remaining to be adjudicated as well as whether the nature of the

3   claims already determined is such that no appellate court would have to decide the same issues

4   more than once even if there were subsequent appeals." *Randhawa v. Skylux, Inc.*, No. CIV. 2:09-

5   02304 WBS DAD, 2013 WL 1152063, at *2 (E.D. Cal. Mar. 19, 2013) (internal quotation marks

6   and citation omitted).

7          Although the order dismissing Burnham with prejudice suffices as a final judgment, the

8   Court declines to enter judgment in Burnham's favor at this time.  Although the Court recognizes

9   Burnham's interest in finality, which would be best met by an entry of judgment, at oral argument

10   Plaintiffs agreed that their inclusion of Burnham in the case caption and in the list of defendants

11   was in error in light of the Court's earlier order and also agreed to remove him from the case

12   caption and narrative of any further amended complaint.  In light of Plaintiffs' recognition that

13   Burnham is no longer in the case and her representation that he will be removed from any further

14   pleadings, the Court DENIES Burnham's motion for entry of judgment pursuant to Rule 54(b).

15   **II.    Defendants' Motion to Dismiss (Dkt. No. 47)**

16          **A.    Legal Standard**

17          A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege

18   "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

19   *Twombly*, 550 U.S. 544, 570 (2007).  A facial plausibility standard is not a "probability

20   requirement" but mandates "more than a sheer possibility that a defendant has acted

21   unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations

22   omitted).  For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual

23   allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the

24   non-moving party." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir.

25   2008).  "[D]ismissal may be based on either a lack of a cognizable legal theory or the absence of

26   sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare*

27   *Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotations and citations omitted); *see*

28   *also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a

United States District Court
Northern District of California

1   claim on the basis of a dispositive issue of law").

2           Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), under

3   which a party is only required to make "a short and plain statement of the claim showing that the

4   pleader is entitled to relief," a "pleading that offers 'labels and conclusions' or 'a formulaic

5   recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678

6   (quoting *Twombly*, 550 U.S. at 555). "[C]onclusory allegations of law and unwarranted inferences

7   are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir.

8   2004); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint

9   or counterclaim may not simply recite the elements of a cause of action, but must contain

10  sufficient allegations of underlying facts to give fair notice and to enable the opposing party to

11  defend itself effectively."). The court must be able to "draw the reasonable inference that the

12  defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "Determining whether a

13  complaint states a plausible claim for relief . . . [is] a context-specific task that requires the

14  reviewing court to draw on its judicial experience and common sense." *Id.* at 663-64.

15          If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no

16  request to amend the pleading was made, unless it determines that the pleading could not possibly

17  be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en

18  banc) (internal quotation marks and citations omitted).

19          **B.     Analysis**

20                  1.     Section 1983 Claim

21          Plaintiffs' first cause of action is a Section 1983 claim against all Defendants. Section

22  1983 is not a source of substantive rights, but rather "a method for vindicating federal rights

23  elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). To state a claim under

24  Section 1983, a complaint "must both (1) allege the deprivation of a right secured by the federal

25  Constitution or statutory law, and (2) allege that the deprivation was committed by a person acting

26  under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). To

27  adequately plead these elements, the complaint must identify what constitutional or other federal

28  right each defendant violated, providing sufficient facts to plausible support each purported

United States District Court
Northern District of California

12

United States District Court
Northern District of California

violation.  *See, e.g.*, *Drawsand v. F.F. Props., L.L.P.*, 866 F. Supp. 2d 1110, 1121 ("Aside from passing references to due process and equal protection, the Complaint fails to allege how [plaintiff's] constitutional rights were violated and fails to identify each Defendant's role therein."); *Walsh v. Am. Med. Response*, No. 2:13-cv-2077 MCE KJN (PS), 2014 WL 2109946, at *7 (E.D. Cal. May 20, 2014) ("Before any claims may be found to be cognizable, plaintiffs must separate each specific claim they wish to pursue, identify which defendants relate to each particular claim, and identify the Constitutional right implicated by each claim.").

a.    *Constitutional Violation*

In reviewing the initial complaint, the Court dismissed the Section 1983 claim in part because Plaintiffs failed to identify the particular constitutional right that each defendant was alleged to have violated.  "Where multiple defendants are involved, the pleadings must establish a nexus between *each* defendant's actions and the alleged deprivation of plaintiff's constitutional rights."  *Drawsand*, 866 F. Supp. 2d at 1120-21.  The FAC suffers from the same defect: it still asserts a laundry list of constitutional rights then urges generally that all Defendants have interfered with the listed rights.  (Dkt. No. 46 ¶¶ 2, 76.)  While the FAC contains 48 pages of allegations that Plaintiffs incorporate in full into their 3-paragraph Section 1983 cause of action, they have not, at least in the FAC, specified which allegations pertain to which purported constitutional violation nor provided an affirmative link between each defendant's actions and the claimed constitutional deprivation, as required.  *See Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

At oral argument, the Court sought clarification from Plaintiffs on their claims, and counsel represented that Plaintiffs were alleging only the following four constitutional violations: (1) a violation of Plaintiffs' First Amendment liberty interest in caring for their horses; (2) a Fifth Amendment double jeopardy claim; (3) an Eighth Amendment claim for excessive fines; and (4) a Fourth Amendment claim for unlawful seizure of Plaintiffs' horses.  The Court will therefore consider only these claims.  *See United States v. Bentson*, 947 F.2d 1353, 1356 (noting that parties are generally bound by the statements of their attorneys) (citations omitted).

13

i.     First Amendment

Plaintiffs allege that all Defendants interfered with their "First Amendment liberty interests in privacy and property." (Dkt. No. 46 ¶ 76.)  The FAC does not provide any further explanation of the theory of such violation, particular facts giving rise to the violation, or which Defendants contributed to the violation and how.  In their opposition, Plaintiffs clarify the basis of their First Amendment claim: that California Penal Code Section 597.1 permits disagreement between Plaintiffs and Defendants regarding animal husbandry choices, such as the type of shelter required for horses or extent of allowable fluctuations in weight.  (Dkt. No. 55 at 8.)  Putting aside that, as the Court has already explained, the Court does not consider facts alleged for the first time in the opposition to a motion to dismiss, even considering these facts for the purposes of whether to grant leave to amend, this is not a First Amendment claim.  Plaintiffs were unable to cite any authority either in their briefing or at oral argument that holds that an individual has a First Amendment right to animal husbandry choices, and the Court has found none.  Accordingly, Plaintiffs' Section 1983 claim predicated on a violation of the First Amendment is dismissed with prejudice.[4]

ii.     Fifth Amendment

Plaintiffs also allege that Defendants violated their Fifth Amendment rights.  (Dkt. No. 46 ¶ 76.)  At oral argument, Plaintiffs represented that their Fifth Amendment claim was solely a double jeopardy claim.[5]  The Double Jeopardy Clause prohibits "(1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense."  *Molina v. Harrington*, No. CV 11-2073-RGK (PLA), 2012 WL 2262424, at *19 (C.D. Cal. May 22, 2012).  The gravamen of Plaintiff's double jeopardy argument is that Section 597.1(f) administrative hearings are criminal in nature such that the subsequent criminal proceedings in which Jill ultimately pleaded guilty to a misdemeanor

---

[4] A dismissal with prejudice means that Plaintiffs are not permitted to allege a First Amendment claim in any amended complaint.

[5] The double jeopardy prohibition of the Fifth Amendment applies to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794-95 (1969).  Thus, this is technically a Fourteenth Amendment claim.

United States District Court
Northern District of California

1   violate the Fifth Amendment's proscription against double jeopardy.

2       Section 597.1(f) administrative hearings are akin to civil forfeiture proceedings that often

3   precede criminal prosecutions.  The Supreme Court held in *United States v. Ursery*, 518 U.S. 267

4   (1996), that in rem civil forfeiture of the plaintiff's house for facilitating unlawful distribution of

5   marijuana pursuant to 21 U.S.C. § 881(a)(7) did not constitute a second punishment for the same

6   offense despite the defendant's prior federal criminal conviction.  Specifically, the Supreme Court

7   concluded that "[t]hese civil forfeitures (and civil forfeitures generally) do not constitute

8   'punishment' for purposes of the Double Jeopardy Clause."  *United States v. Ursery*, 518 U.S.

9   267, 270-71 (1996).

10      The Ninth Circuit has recognized that the Supreme Court's holding in *Ursery* "was not

11  absolute, however."  *U.S. v. $273,969.04 in U.S. Currency*, 164 F.3d 462, 465 (1999) ("*273*").

12  Instead of create a *per se* rule that civil forfeitures do not trigger double jeopardy problems, the

13  Supreme Court noted that "where the clearest proof indicates that [civil forfeiture proceedings are]

14  so punitive either in purpose or effect as to be equivalent to a criminal proceeding, that forfeiture

15  may be subject to the Double Jeopardy Clause."  *Ursery*, 518 U.S. at 289 n.3 (internal quotation

16  marks and citation omitted).  Courts determining whether a forfeiture is civil or criminal in nature

17  must apply the following test:

18          Whether a particular punishment is criminal or civil is, at least
19          initially, a matter of statutory construction.  A court must first ask
            whether the legislature, in establishing the penalizing mechanism,
20          indicated either expressly or impliedly a preference for one label or
            the other.  . . . [W]e inquire further whether the statutory scheme
21          was so punitive either in purpose or effect as to transform what was
            clearly intended as a civil remedy into a criminal penalty.

22  *United States v. Reveles*, 660 F.3d 1138, 1140 (9th Cir. 2011) (citation omitted); *see also Hudson*

23  *v. United States*, 522 U.S. 93, 99 (1997) (same).  Applying these standards, the Ninth Circuit has

24  found no double jeopardy where an individual was subject to: (1) an administrative hearing

25  revoking a driver's license for driving while intoxicated in connection with a subsequent

26  prosecution for the same conduct, *see Rivera v. Pugh*, 194 F.3d 1064, 1068-69 (9th Cir. 1999); (2)

27  a civil fine for document fraud following prosecution for conspiracy to commit document fraud,

28  *see Noriega-Perez v. United States*, 179 F.3d 1166, 1171 (9th Cir. 1999); and (3) a civil forfeiture

United States District Court
Northern District of California

15

1   action against currency and jewelry discovered on an individual at an airport following a criminal

2   conviction for making a false statement to customs officials in connection with the same items, *see*

3   *273*, 164 F.3d at 464.

4          Here, although Section 597.1 is part of the Penal Code, which is plainly a criminal statute,

5   the California legislature impliedly gave the administrative hearings provided for in subdivision

6   (f) a civil label inasmuch as it makes clear that the administrative hearings occur "prior to the

7   commencement of any criminal proceedings authorized by this section[.]"  Cal. Penal Code

8   § 597.1.  The legislature also provides for judicial review of the administrative findings apart from

9   any criminal proceedings by allowing individuals to file petitions for writ of mandate pursuant to

10  Civil Code Section 1054.  Taken together, this is enough to establish a presumption that the

11  Section 597.1 determination does not involve a criminal penalty.

12         Nor is the provision punitive in either purpose or effect.  Administrative hearings pursuant

13  to Section 597.1(f) do not carry the possibility of any criminal penalties like fines or

14  imprisonment.  An administrative hearing does not run the risk of a determination of guilt.

15  Instead, its sole purpose is to determine whether seizure of the animal was proper in the first

16  instance.  A finding that seizure was unlawful results in the return of the animal to the owner, and

17  a finding that the seizure was lawful results only in possible fees for maintenance and care of the

18  horse, but does not result in a criminal conviction for animal cruelty.  Thus, it is not sufficiently

19  punitive to give rise to double jeopardy.  In fact, at least one California court has expressly held as

20  much, concluding that criminal prosecution on animal cruelty charges following seizure or

21  confiscation of animals pursuant to Penal Code Section 597.1 does not violate double jeopardy

22  inasmuch as the seizure is a civil forfeiture that is not punishment for double jeopardy purposes.

23  *People v. Speegle*, 53 Cal. App. 4th 1405, 1412 (1997) (rejecting the defendant's argument that

24  she was "'punished' by confiscation of her animals for treatment and placement, and thus filing a

25  criminal complaint afterward amounted to an effort to punish her twice for the same conduct").

26  Accordingly, Plaintiffs' Fifth Amendment claim is dismissed with prejudice.

27                        iii.    Eighth Amendment Excessive Fines

28         At oral argument, Plaintiffs confirmed that they are also bringing an Eighth Amendment

United States District Court
Northern District of California

16

claim.  As Plaintiffs' counsel explained at the hearing, they claim that animal seizures under Section 597.1 render the animal owner liable for costs at the discretion of the animal services agency, and the actual costs imposed are arbitrarily high and have no relation to the actual cost to care for a horse such that they are the functional equivalent of a penalty or punishment.

The Excessive Fines clause of the Eighth Amendment limits the government's power to extract payments as punishment for some offense.  *United States v. Bajakajian*, 524 U.S. 321, 324 (1998).  Civil fines and sanctions can fall within the scope of the Eighth Amendment.  *See Hudson*, 522 U.S. at 103 ("The Eighth Amendment protects against excessive civil fines, including forfeitures.") (citation omitted); *United States v. Mackby*, 261 F.3d 821, 829 (9th Cir. 2001).  An Excessive Fines clause analysis begins by determining whether the payment to the government constitutes punishment for an offense by considering whether it serves a retributive or deterrent, as opposed to remedial, purpose.  *Mackby*, 261 F.3d at 829.  To determine whether a civil sanction is punitive or remedial, "the court considers factors such as the language of the statute creating the sanction, the sanction's purpose(s), the circumstances in which the sanction can be imposed, and the historical understanding of the sanction."  *Id.* at 830 (quotation marks and citation omitted).  "Only where a court first determines that a sanction is imposed for punitive purposes, does the ultimate question of whether the payment is grossly disproportionate to the gravity of the defendant's offense arise."  *U.S. ex rel. Satalich v. City of Los Angeles*, 160 F. Supp. 2d 1092, 1103 (C.D. Cal. 2001) (citing *Mackby*, 261 F.3d at 829).

Here, the statutory language regarding costs in Section 597.1 provides that "the full cost of caring for and treating any animal properly seized under this subdivision or pursuant to a search warrant shall constitute a lien on the animal and the animal shall not be returned to its owner until the charges are paid, if the seizure is upheld pursuant to this section."  Cal. Penal Code § 597.1(a)(1).  The animal owner becomes "personally liable to the seizing agency for the cost of the seizure and care of the animal[.]"  *Id.* § 597.1(f)(4) & (h).  The fees Plaintiffs identified in the FAC include an "impound fee," "trailering fees," "board at $75 per day," and "veterinary costs." (Dkt. No. 46 ¶ 58.)  The Court is hard-pressed to even use the word "sanction" to define the payments that this law requires of animal owners, as the plain language of the statutory section

17

provides that it is intended to reimburse the agency's cost of care and treatment only, which indicates a remedial purpose. The Ninth Circuit has repeatedly held that fees meant to reimburse the government for investigation-related or other expenses are remedial, not punitive. *See, e.g.*, *Noriega-Perez*, 179 F.3d at 1173 (holding that "reimbursing the government for enforcement expenditures" furthers a "non-punitive purpose"); *Louis v. C.I.R.*, 170 F.3d 1232, 1235 (9th Cir. 1999) (noting that additions to tax for fraud are remedial because they "are provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud") (citation omitted). Similarly, the statute allows for costs to be imposed solely upon an administrative finding that the seizure was lawful in the absence of a pending criminal case, let alone a conviction meriting punishment. Moreover, the statute suggests that payment is at the option of the animal owner; the owner has the choice to decline to pay the costs and forfeit ownership of the animal. *See* Cal. Penal Code § 597.1(h). For each of these reasons, the allegations in the FAC fail to plausibly establish that the costs imposed on Plaintiffs for care and treatment of the horses were punitive, and Plaintiffs therefore fail to state a claim for violation of their Eighth Amendment right to avoid excessive fines and penalties. Plaintiffs' Eighth Amendment claim is therefore dismissed with prejudice.

iv.   Fourth Amendment Unlawful Seizure

Based on Plaintiffs' explanation at oral argument, their final Section 1983 predicate constitutional violation is for unlawful seizure of property under the Fourth Amendment. "The simple language of the [Fourth] Amendment applies equally to seizures of persons and to seizures of property." *Payton v. New York*, 445 U.S. 573, 585 (1980). There was no warrant for the seizure of Plaintiffs' horses. Normally the lawfulness of a warrantless seizure turns on whether there was probable cause—*i.e.*, a fair probability—to believe that criminal activity was afoot. *See United States v. Brooks*, 367 F.3d 1128, 1134 (9th Cir. 2004). However, in the context of Section 597.1 seizures, the Fourth Amendment claim turns on whether the officers had reasonable grounds to believe that very prompt action was required to protect the health and safety of the animals seized. *See* Cal. Penal Code § 597.1. As one California court has explained, this is "the

18

equivalent of the exigent circumstances exception familiar to search and seizure law." *Broden*, 70 Cal. App. 4th at 1220-21. Although not plainly set forth in the recitation of claims itself, the FAC alleges enough facts to plausibly establish that there were no reasonable grounds to believe Plaintiffs' horses required such immediate care. For example, Plaintiffs allege that the seized horses were "standing and moving normally, could eat food, were provided food and water and were otherwise unremarkable in their condition[,]" "had the benefit of shelter of their naturally hairy coats[,]" that Defendants knew that horses were subject to seasonal weight fluctuations, and that there was feed present on the property. (Dkt. No. 46 ¶¶ 45-47, 53.) This is enough, at the motion to dismiss stage, to allege that there were no reasonable grounds for the officers to believe seizure of the horses was necessary to protect their health and safety. Thus, the factual allegations of the FAC state a claim for violation of Plaintiffs' Fourth Amendment rights. But Plaintiffs must still amend the FAC to clearly set forth their theory of Fourth Amendment violation—and in particular, each defendant's involvement—in the recitation of claims; as set forth below, the FAC does not state a claim for Fourth Amendment violation against each named defendant.

> b.   *Committed by a Person Acting under Color of State Law*

As the only Section 1983 claim remaining is the Fourth Amendment claim, the Court will address whether Plaintiffs have adequately alleged a claim against each defendant. The FAC alleges that Marin Humane Society officers Machado, Hill and Rogers were present at the Chileno Valley Road property and made the decisions to seize the horses. (Dkt. No. 46 ¶¶ 41, 44, 51, 53.) The FAC adequately alleges that Machado, Hill, and Rogers violated their Fourth Amendment rights by seizing Plaintiffs' horses without reasonable grounds to believe that very prompt action was required to protect the health and safety of the horses, thus, with no probable cause to believe Plaintiffs were in violation of Penal Code Section 597.1. As these defendants were alleged to have been acting in their capacity as Marin Humane Society officers, the FAC sufficiently alleges that they were acting under the color of state law.

Although Section 1983 makes liable only those who act under color of state law, "even a private person can, in certain circumstances, be subject to liability under [S]ection 1983." *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 954 (9th Cir. 2008) (en banc). To state a claim for

1    Section 1983 liability of a private person, the plaintiff must show that "the conduct allegedly

2    causing the deprivation of a federal right [was] fairly attributable to the State." *Tsao v. Desert*

3    *Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (quotation marks and citation omitted). "The

4    Supreme Court has articulated four tests for determining whether a private [party's] actions

5    amount to state action: (1) the public function test; (2) the joint action test; (3) the state

6    compulsion test; and (4) the governmental nexus test." *Franklin v. Fox*, 312 F.3d 423, 444-45 (9th

7    Cir. 2002). At oral argument, Plaintiffs noted that they are proceeding under the joint action

8    theory.

9         The joint action test asks "whether state officials and private parties have acted in concert

10   in effecting a particular deprivation of constitutional rights." *Id.* at 445 (internal quotation marks

11   and citation omitted). This requirement can be satisfied by plausibly pleading "the existence of a

12   conspiracy or by showing that the private party was 'a willful participant in joint action with the

13   State of its agents.'" *Id.* (quoting *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989)).

14   "A private party is liable under this theory, however, only if its particular actions are 'inextricably

15   intertwined' with those of the government." *Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d

16   1205, 1211 (9th Cir. 2002) (citation omitted). "[A] bare allegation of . . . joint action will not

17   overcome a motion to dismiss; the plaintiff must allege facts tending to show that [private

18   defendants] acted under color of state law or authority." *DeGrassi v. City of Glendora*, 207 F.3d

19   636, 647 (9th Cir. 2000) (citation omitted). And to show the conspiracy underlying joint action, a

20   plaintiff must set forth facts that plausibly establish that "there was a meeting of the minds ex ante

21   between the officers" and the private persons. *Ennis v. City of Daly City*, 756 F. Supp. 2d 1170,

22   1175 (N.D. Cal. Nov. 2, 2010) (citations omitted); *see also Fonda v. Gray*, 707 F.2d 435, 438 (9th

23   Cir. 1983 ("To prove a conspiracy between the state and private parties under [S]ection 1983, the

24   [plaintiff] must show an agreement or meeting of the minds to violate constitutional rights."). The

25   plaintiff bears the burden of establishing that an individual defendant is a state actor. *Florer v.*

26   *Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011).

27        In their opposition, Plaintiffs argue generally that "[t]hese Defendants seek to enforce

28   invalid state laws and regulations and/or policy therefore act under color of law." (Dkt. No. 55 at

United States District Court
Northern District of California

1   4.)  This argument fails to tailor the color-of-law analysis to each defendant or to address the

2   relevant points.  The Court will do so here.

3                                    i.      Defendant Wagman

4            According to the FAC, Wagman is the Chief Outside Litigation Director of the Animal

5   Legal Defense Fund in San Francisco and also serves as a member of the Marin Humane Society

6   Board of Directors and its authorized spokesperson.  (Dkt. No. 46 ¶ 19.)  Wagman "caused [the

7   Marin Humane Society] to hire individuals with personal and political affiliations with himself

8   (and the [Animal Legal Defense Fund]) to administer the reporting and referee and covertly or

9   overtly directed those individuals in such a manner as to ensure the Plaintiffs would not have a fair

10  [administrative] hearing[.]"  (*Id.*)  Plaintiffs allege that Wagman himself disrupted their first

11  administrative hearing.  (*Id.*)  Plaintiffs further allege that Wagman made misrepresentations about

12  the status of Plaintiffs' horses online, violated a confidentiality agreement by making statements

13  about Jill's animal cruelty conviction, and advertised the Marin Humane Society's plan to

14  distribute Plaintiffs' horses to new owners instead of returning them.  (*Id.*)  Beyond those facts set

15  forth in the introduction of parties, the FAC also indicates that Wagman was involved in the Marin

16  Humane Society's incident with Plaintiffs' horses only after the seizures had already occurred.

17  Specifically, the Marin Humane Society and Wagman demanded that Plaintiffs pay fees incurred

18  for the care of the seized horses or risk abandonment.[6]  (Dkt. No. 46 ¶¶ 58-61.)

19           None of these facts pertain to the actual seizure of the horses and the alleged violation of

20  Plaintiffs' Fourth Amendment rights.  Thus, Plaintiffs fail to state a Fourth Amendment claim

21  against Wagman.  Nor have Plaintiffs established that Wagman was acting under color of state law

22  for the purposes of any claim, as there are no facts from which the Court can plausibly infer that

23  Wagman agreed in advance with the Marin Humane Society officers to participate in a scheme to

24

25  [6] Plaintiffs also allege that Wagman "ignored the restrictions on comment regarding the judicial
    proceedings or Jill Burnell" that were alleged to have been part of the "judicial settlement offer"
26  that required that the Marin Humane Society refrain from publicly commenting about the case.
    (Dkt. No. 46 ¶ 69.)  However, this allegation conflicts with Jill's written plea agreement of which
27  the Court takes judicial notice, which contains no such confidentiality clause.  (Dkt. No. 48-2 at 4-
    6.)  The Court declines to accept as true a factual allegation that conflicts with judicially
28  noticeable documents.

United States District Court
Northern District of California

violate Plaintiffs' constitutional rights.  *See Fonda*, 707 F.2d at 438; *Ennis*, 756 F. Supp. 2d at 1175.  In short, though Plaintiffs have alleged that Wagman was involved with the Marin Humane Society and took some action relating to the agency's legal action against Plaintiffs after their horses had been seized, there are no facts that plausibly establish that Wagman conspired in any way or cooperated in a substantial degree with Rogers, Hill, and Machado's decisions to seize the horses on those two occasions in the first instance.  Thus, the Section 1983 claim against Wagman must be dismissed.

### ii.  Defendant Ricci

Unlike Wagman, Defendant Ricci is not associated with the Marin Humane Society but rather is a private person.  Thus, from the outset, her actions are all the more separated from the Marin Humane Society's.  Ricci is alleged to have "intentionally coordinated a series of false reports concerning the care and condition of the Burnells' horses . . . to create 'evidence' that Plaintiffs were unable or unwilling to provide necessary care for their horses during the fall and winter of 2012 . . . for the purpose of redistributing [Plaintiffs'] horses to others."  (Dkt. No. 46 ¶ 22.)  The Marin Humane Society opened its investigation into Plaintiffs in the Fall of 2012 based on a report from Ricci.  (*Id.* ¶ 35.)  Specifically, Ricci told the Marin Humane Society that Plaintiffs had moved their livestock breeding business from Sonoma County to Marin County and stated that Plaintiffs had 40-50 horses on the property without food and shelter.  (*Id.*)  The night before the first horse seizure, Ricci wrote an email to Rogers informing her that two of Plaintiffs' stallions had gotten into a fight and noting that a particular veterinarian was going to the property to attend to the horses.  (*Id.* ¶ 41.)  Ricci learned this information from Defendant Ghilotti.  (*See id.* ¶ 41 n.4.)

The FAC does not allege that Ricci was present when certain Marin Humane Society officers and the Sheriff's deputy seized Plaintiff's horses.  Instead, Plaintiffs urge that Ricci participated in a conspiracy to deprive Plaintiffs of their horses.  Notably, there is no conspiracy allegation in the FAC.  But even if there were, such a conclusory allegation would not suffice to plausibly allege that Ricci was acting under color of state law for the purposes of Section 1983 liability.  Moreover, the allegations in the complaint pertaining to Ricci's reports to the Marin

22

1    Humane Society do not give rise to color-of-law Section 1983 liability, either.  "[M]erely

2    complaining to the police does not convert a private party into a state actor."  *Collins*, 878 F.2d at

3    1154.  Even if Ricci's reports were false as alleged, the Court has already explained to Plaintiffs

4    that "[p]roviding false information to the police does not transform a private individual into a state

5    actor" absent sufficient facts from which the court could plausibly infer that the police knew the

6    information was false and agreed with the informant to conspire against the plaintiff.  *Lauter v.*

7    *Anoufrieva*, 642 F. Supp. 2d 1060, 1088 (C.D. Cal. 2008); *Arnold v. Int'l Bus. Machs. Corp.*, 637

8    F.2d 1350, 1357-58 (9th Cir. 1982) (citation omitted).  The FAC does not include facts that

9    plausibly allege either (1) that the police knew Ricci's information was false or (2) that

10   demonstrate a meeting of the minds between Ricci and the Marin Humane Society defendants to

11   conspire against Plaintiffs.  Accordingly, Plaintiffs fail to state a Section 1983 claim against Ricci.

12                                   iii.       Defendant Ghilotti

13           The same holds true for Ghilotti, who is another horse breeder in the same discipline as Jill

14   and her formerly close personal friend, competitor, and sometimes client.  (Dkt. No. 46 ¶ 23.)

15   Ghilotti visited Plaintiffs' Chileno Valley Road Property in September 2012, when she transported

16   two of Plaintiffs' horses there from their former home in Sonoma County.  (*Id.*)  Ghilotti owes

17   Plaintiffs money for goods and services Plaintiffs provided, and at some point agreed to provide

18   construction materials and horse feed in lieu of money.  (*Id.*)  Ghilotti "coordinated the delay in

19   delivery [of those items] with MHS and Ricci to create 'evidence' that Plaintiffs were unable or

20   willing to provide necessary care for their horses and for the purpose of redistributing [Plaintiffs']

21   horses to others."  (*Id.*)  Ghilotti also made false reports to Ricci and Rogers about Jill and her

22   horses.  (*Id.*)  Ghilotti was present at the Chileno Valley Road Property on December 26, 2012—

23   the night of the stallion fight.  (*Id.*)  Upon arrival, Ghilotti urged that the stallions be shot dead

24   because their injuries were mortal and unrecoverable.  (*Id.*)  These are the only allegations in the

25   FAC about Ghilotti.

26           These allegations are not enough to state a Section 1983 claim against Ghilotti for

27   violation of Plaintiffs' Fourth Amendment rights.  First, there are no allegations that Ghilotti was

28   present and involved in the actual seizure of Plaintiffs' horses.  And to the extent that her other

United States District Court
Northern District of California

23

United States District Court
Northern District of California

alleged conduct relates to the seizure, the FAC still fails to state a claim.  For the same reasons discussed above with respect to Ricci, merely making a false report to the police does not make Ghilotti a state actor for the purposes of Section 1983 absent allegations demonstrating that the Marin Humane Society officers knew the information was false and that Ghilotti and the Marin Humane Society reached an agreement to violate Plaintiffs' constitutional rights.  The FAC does not plausibly allege such facts.  While the FAC does state that Ghilotti "coordinated the delay in delivery" of feed and construction materials with the Marin Humane Society, there are no facts underlying this conclusory allegation.  Accordingly, the FAC fails to demonstrate that Ghilotti was acting under color of law and, accordingly, fails to state a Section 1983 claim against her.

iv.      Defendant Keefer

Defendant Nathan Keefer is a licensed veterinarian—though not an equine specialist—who lives and works in Sonoma County.  (Dkt. No. 46 ¶ 21.)  Both Plaintiffs and the Marin Humane Society have been clients of Dr. Keefer's veterinary practice.  (*Id.*)  Dr. Keefer was present at the Chileno Valley Road Property during the December 27, 2012 seizure of the first two of Plaintiffs' horses.  (*Id.*)  Because Dr. Keefer and Plaintiff had a pre-existing dispute regarding an unpaid veterinary bill, Dr. Keefer informed Rogers that he was not the appropriate person to evaluate Plaintiffs' horses, but Rogers demanded that Dr. Keefer come because there were injured horses on the property that had not received veterinary care.  (*Id.*)  Dr. Keefer "failed to examine properly any horse present and failed to preserve evidence of the Plaintiffs' horses' good condition and did not make an accurate, contemporaneous medical record of his examination as his license requires him to do."  (*Id.*)  The FAC alleges that Dr. Keefer "knew or should have known" that Rogers had an improper purpose calling him to Plaintiffs' property and, accordingly, "knowingly and voluntarily allowed his presence to provide a patina of legitimacy" to the Marin Humane Society's otherwise unlawful endeavor.  (*Id.*)  While the FAC describes the seizure in some detail, it provides no further detail regarding Dr. Keefer's role, his conclusions or recommendations about the horses, or how the Marin Humane Society responded to him.

Dr. Keefer's presence at the scene of the seizure is not itself dispositive, as participation in an allegedly unlawful seizure does not necessarily convert a private person into a state actor.

United States District Court
Northern District of California

1    *Brunette*, 294 F.3d at 1210-11.  Instead, courts consider whether the allegations indicate whether

2    the private person planned the unlawful seizure, participated in briefings prior to the unlawful

3    seizure, and was privy to confidential information disclosed prior to the seizure.  *Id*.  Again, at

4    bottom, the question is whether the humane society and private actor acted independently for two

5    independent purposes.  *Id*.

6         Here, both Dr. Keefer and the Marin Humane Society were involved in an analysis of the

7    condition of Plaintiffs' horses.  But there are no allegations that Dr. Keefer participated in

8    planning an unlawful seizure.  And despite the conclusory allegation that Dr. Keefer knew about

9    Rogers' improper purpose and knew that his presence made an otherwise unlawful seizure seem

10   lawful, the actual facts alleged support a contrary conclusion.  Specifically, instead of alleging that

11   Dr. Keefer was in on a scheme to take Plaintiffs' horses away at all costs, the FAC alleges that Dr.

12   Keefer did not want to be involved given his history with Jill, but nonetheless joined the Marin

13   Humane Society when they told him there were injured animals.  (Dkt. No. 46 ¶ 21.)  While

14   Plaintiffs allege that Dr. Keefer "knew or should have known" that Rogers had an improper

15   purpose in calling him to the task, there are no facts alleged to support this conclusory allegation,

16   and no facts from which a reasonable inference can be drawn that Dr. Keefer and the Marin

17   Humane Society defendants had a meeting of the minds in which they agreed to violate Plaintiffs'

18   Fourth Amendment rights by taking away her horses regardless of their condition.  In short,

19   Plaintiffs have alleged that Dr. Keefer was present and participated in the seizure, but have not

20   plausibly alleged that Dr. Keefer acted under color of state law while there.  The Section 1983

21   claim against Dr. Keefer therefore must be dismissed.

22              v.    Defendant McKenney

23        Defendant McKenney is the Chief Executive Officer and a supervisory employee of the

24   Marin Humane Society.  (Dkt. No. 46 ¶ 12.)  McKenney "authorized or failed to act to ensure that

25   [the] Marin Humane Society's policies, practices and procedures (including training and

26   supervision of employees) were lawful and/or non-negligent" and otherwise "set in motion a series

27   of acts [and] knew and/or reasonably should have known that her subordinates were engaging in

28   acts that would deprive Plaintiffs of their rights and failed to prevent her subordinates from

                                                   25

1    engaging in such conduct." (*Id.*)

2         "In a [Section 1983] action—where masters do not answer for the torts of their servants—

3    the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government

4    official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556

5    U.S. at 677.  The Ninth Circuit permits "plaintiffs to hold supervisors individually liable in

6    [Section] 1983 suits when culpable action, or inaction, is directly attributed to them." *Starr v.*

7    *Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011).  "[A] supervisor faces liability under the Fourth

8    Amendment only where it would be clear to a reasonable [supervisor] that his conduct was

9    unlawful in the situation he confronted." *Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir.

10   2012) (quotation marks and citation omitted).  To meet this standard, a plaintiff must allege a

11   "factual basis for imputing . . . knowledge" of an unconstitutional practice undertaken by

12   subordinates, coupled with culpable action or inaction."[7] *Id.* at 1111.  Here, Plaintiff appears to

13   allege both failure to train and deliberate indifference—essentially two sides of the same coin.

14        "[F]ailure to train . . . employees in a relevant respect must amount to 'deliberate

15   indifference to the rights of persons with whom the [untrained employees] come into contact."

16   *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).  "Deliberate indifference is a stringent

17   standard of fault, requiring proof that a [government] actor disregarded a known or obvious

18   consequence of his action." *Id.* at 1360 (internal quotation marks and citation omitted).  When a

19   governmental supervisor is "on actual or constructive notice that a particular omission in their

20   training program causes [subordinates] to violate citizens' constitutional rights, [supervisors] may

21   be deemed deliberately indifferent if the [supervisors] choose to retain the program. *Id.* (internal

22   quotation marks and citation omitted).

23        The FAC alleges no facts to support the inference that McKenney was responsible for

24   training or supervising Rogers, Hill, and Machado—the Marin Humane Society officers alleged to

25

26   _____

     [7] The FAC does not indicate whether Plaintiffs bring the Section 1983 claim against McKenney in
27   her individual capacity or her official capacity as Marin Humane Society CEO.  This is a
     distinction without a difference as the same standard applies under either scenario.  *See Flores v.*
28   *Cnty. of Los Angeles*, 758 F.3d 1154, 1158-59 (9th Cir. 2014) ("As to an official in his individual
     capacity, the same standard applies[.]").

have violated Plaintiffs' Fourth Amendment rights by seizing their horses.  In addition, the FAC fails to allege sufficient facts to permit a reasonable inference that McKenney "disregarded a known or obvious consequence" or her failure to properly train or supervise Marin Humane Society officers, let alone in particular on how and when it is appropriate to seize horses pursuant to Penal Code Section 597.1.  *See Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009); *see also Connick*, 131 S.Ct. at 1360.  Plaintiffs only allege that the Marin Humane Society unlawfully seized their horses.  This single incident is not enough to give rise to deliberate indifference of a known risk of Fourth Amendment violations.  *See Frary v. Cnty. of Marin*, 81 F. Supp. 3d 811, 840 (N.D. Cal. 2015) (noting that the "single-incident" theory of deliberate indifference liability is possible only "in a narrow range of circumstances"); *see also Cannon v. City of Petaluma*, No. C 11-0651 PJH, 2012 WL 1183732, at *19 (N.D. Cal. Apr. 6, 2012) ("[Plaintiff's] allegations in the SAC relate solely to his own, isolated experiences, which cannot support a *Monell* claim for failure to train or supervise.").  There are no other facts alleged that connect McKenney to a failure to train her employees or otherwise lead to the plausible inference that McKenney was aware of that the Marin Humane Society staff was likely to violate Plaintiffs' Fourth Amendment rights.  Accordingly, the Section 1983 claim against McKenney is dismissed.

c.      *Monell* Claim Against Marin Humane Society

The Marin Humane Society seeks to dismiss the Section 1983 against it on the grounds that Plaintiffs fail to state a claim of municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978).[8]  Municipalities can be held liable as "persons" under Section 1983, but not for the unconstitutional acts of their employees based solely on respondeat superior.  *Id.* at 691.  Instead, a plaintiff seeking to impose liability on a municipality under Section 1983 must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Johnson v. Shasta Cnty.*, 83 F. Supp. 3d 918, 930 (E.D. Cal. Jan. 6, 2015) (citation omitted).  A *Monell* claim can take one of three forms: "(1) when official policies or

---

[8] The Marin Humane Society is a private entity contracted with the local government to provide animal services.  Though it is not a municipality, courts in the Ninth Circuit apply the *Monell* analysis to such entities.  *See Young v. Cnty. of Hawaii*, 947 F. Supp. 2d 1087, 1114 (D. Haw. 2013) (citing *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1129 (9th Cir. 2012)).

United States District Court
Northern District of California

established customs inflict a constitutional injury; (2) when omissions or failures to act amount to a local government policy of 'deliberate indifference' to constitutional rights; or (3) when a local government official with final policy-making authority ratifies a subordinate's unconstitutional conduct." *Brown v. Contra Costa Cnty.*, No. C 12-1923 PJH, 2014 WL 1347680, at *8 (N.D. Cal. Apr. 3, 2014) (citing *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010)). Whichever method is chosen, the plaintiff must plead facts sufficient to plausibly establish that "the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

The FAC largely describes the conduct of Marin Humane Society employees Rogers, Machado, and Hill and the actions they took to seize Plaintiffs' horses. The Marin Humane Society cannot be liable for their conduct solely on a respondeat superior basis. *See Monell*, 436 U.S. at 690-91. The FAC does not clearly set forth how Plaintiffs are seeking to allege *Monell* liability against the Marin Humane Society. At oral argument, Plaintiffs suggested that the "policy" at issue was the Marin Humane Society's policy of allowing its animal services officers to act as humane officers or peace officers despite their lack of credentials required for those positions. (*See also* Dkt. No. 46 ¶ 10.) Even if this were so, Plaintiffs have not included allegations that would allow the Court to infer that their Fourth Amendment injury here—*i.e.*, the seizure of the horses pursuant to Penal Code Section 597.1—was caused by that policy because the FAC alleges that a Sheriff's deputy was present at the time of both seizures. (*Id.* ¶¶ 41, 51.) The FAC does not set forth any other policy or practice that might give rise to *Monell* liability. The Section 1983 claim against the Marin Humane Society is therefore dismissed with leave to amend. Plaintiffs shall have an opportunity to set forth in clear and precise terms what Marin Humane Society policy they contend is the moving force behind their Fourth Amendment violation.

### 2.   State Law Claims

Plaintiffs also bring six state-law tort claims against all Defendants. Defendants appear to concede that Plaintiffs' second cause of action for trespass to land, third cause of action for trespass to chattels, and fourth cause of action for conversion are adequately pleaded. However,

1    Defendants challenge the sufficiency of the fifth cause of action for portraying Plaintiffs in a false

2    light, the sixth cause of action for public disclosure of private facts, and the seventh cause of

3    action for intentional and/or negligent infliction of emotional distress.

4                    a.    *State-Based Immunity*

5            Before addressing whether Plaintiffs have adequately pleaded their state law claims, the

6    Court first addresses whether the Marin Humane Society and its employees are immune from state

7    law tort claims as Defendants argue.  Plaintiffs, for their part, urge that the Marin Humane Society

8    is not a public entity, but rather a private independent contractor of the county and therefore its

9    employees are not public employees for the purposes of government immunity from tort suit.

10           The California Tort Claims Act provides that a "public entity is not liable for an injury,

11   whether such injury arises out of an act or omission of the public entity or a public employee or

12   any other person."  Cal. Gov't Code § 815.  Similarly, "a public employee is not liable for an

13   injury resulting from his act or omission where the act or omission was the result of the exercise of

14   the discretion vested in him, whether or not such discretion be abused."  *Id.* § 820.2.  This

15   discretionary immunity applies when the law imposes a discretionary duty on public employees.

16   *See Posey v. California*, 180 Cal. App. 3d 836, 847 (1986).  Courts have applied Section 815's

17   immunity to protect entities providing emergency dispatch services, *Eastburn v. Regional Fire*

18   *Protection Auth.*, 31 Cal.4th 1175, 1184 (2003), school districts, *Patterson v. Sacramento City*

19   *Unified Sch. Dist.*, 155 Cal. App. 4th 821, 828-29 (2007), and regional park districts, *Bragg v.*

20   *East Bay Regional Park Dist.*, No. No. C-02-3585-PJH, 2003 WL 23119278, at *7 (N.D. Cal.

21   Dec. 29, 2003).  In contrast, immunity does not apply to private correctional facilities, *Lawson v.*

22   *Super. Ct.*, 180 Cal. App. 4th 1372, 1383 (2010), or the Golden Gate Bridge, Highway and

23   Transportation District, *Michaeledes v. Golden Gate Bridge, Highway & Transp. Dist.*, 202 F.

24   Supp. 2d 1109, 1113 (N.D. Cal. 2002).

25           The first question is whether the Marin Humane Society qualifies as a public entity.  The

26   California Tort Claims Act defines "public entity" to include "the state, the Regents of the

27   University of California, the Trustees of the California State University and the California State

28   University, a county, city, district, public authority, public agency, and any other political

United States District Court
Northern District of California

29

1    subdivision or public corporation in the state."  Cal. Gov't Code § 811.2.  Of course, animal

2    services agencies are not expressly included in this list.

3           The state empowers the Marin Humane Society to "enforce the provisions of laws of this

4    state for the prevention of cruelty to animals."  Cal. Corp. Code § 14501; *see also Animal Legal*

5    *Defense Fund v. Mendes*, 160 Cal. App. 4th 136, 142 (2008) ("[T]he law confers quasi-

6    governmental powers on these corporations.").  In support of their contention that the Marin

7    Humane Society and its employees are subject to state law immunity, Defendants rely on *Jackson*

8    *v. Silicon Valley Animal Control Authority*, No. C 07-5667, 2008 WL 4544455, at *5 (N.D. Cal.

9    Oct. 2, 2008).  In *Jackson*, the Silicon Valley Animal Control Authority ("SVACA") seized

10   animals from the plaintiffs pursuant to Penal Code Section 597.1, then turned the animals over to

11   the county humane society.  *Id.* at *5-7.  The court held that the Silicon Valley Animal Control

12   Authority ("SVACA"), the City [ ], and the [SVACA] officers "are public entities or public

13   employees entitled to immunity, to the extent they followed the procedures set forth in Section

14   597.1, they cannot be liable for any state law tort against the [plaintiffs]."  *Id.*  In short, the court's

15   immunity finding was twofold: (1) SVACA and the officers are public entities and/or employees;

16   and (2) SVACA and the officers were exercising discretion that Penal Code Section 597.1 sets

17   forth.  This conclusion did not apply to the humane society, which was not involved in the seizure

18   and did not seek tort immunity.

19          Here, the Marin Humane Society and its employees were exercising discretion under Penal

20   Code Section 597.1, like SVACA in *Jackson*.  It is less clear whether the Marin Humane Society

21   qualifies as a public entity.[9]  The *Jackson* court made clear that SVACA is a public entity created

22   under the California Government Code.  *Id.* at *2.  In contrast, here, the Marin Humane Society is

23   established under the California Corporations Code and operates in contract with the County.

24   Plaintiffs are unable to cite a case to support their position that the Marin Humane Society is *not* a

25   public entity for the purposes of the California Tort Claims Act.  On the other hand, neither have

26

27   _____

     [9] The fact that the Marin Humane Society is treated as a municipality for the purposes of Section
28   1983 actions is not dispositive, since different standards apply and immunity in this context is a
     matter of state statute.

                                                    30

1   Defendants cited any authority to show that it is, and Defendants bear the burden on a 12(b)(6)

2   motion to show that immunity applies.  Thus, the Court cannot conclude at this stage of the

3   litigation that the Marin Humane Society is a public entity, and its employees public employees,

4   entitled to immunity from state torts under California Government Code Section 815.

5            c.   *Fifth Cause of Action: Portraying Plaintiffs in a False Light*

6            Plaintiffs' fifth cause of action against Marin Humane Society, McKenney, Machado,

7   Rogers, Ricci, Ghilotti, and Wagman is for portrayal in a false light.  False light invasion of

8   privacy "is the wrong inflicted by publicity which puts the plaintiff . . . in a false but not

9   necessarily defamatory position in the public eye."  *Benefield v. Bryco Funding, Inc.*, No. C 14-

10  1459 PJH, 2014 WL 2604363, at *5 (N.D. Cal. June 10, 2014).  Under California law, to state a

11  claim for the tort of false light invasion of privacy a plaintiff must plead that "(1) the defendant

12  caused to be generated publicity of the plaintiff that was false or misleading, and (2) the publicity

13  was offensive to a reasonable person."  *Pacini v. Nationstar Mortg., LLC*, No. C 12-04606 SI,

14  2013 WL 2924441, at *9 (N.D. Cal. June 13, 2013) (citing *Fellows v. Nat'l Enquirer*, 42 Cal.3d

15  234, 238-39 (1986)).  "Publicity" requires that the defendant communicate the information "to the

16  public in general or to a large number of persons as distinguished from one individual or few."

17  *Mnatsakanyan v. Cal. Prof. Corp. Cavalry Portfolio Servs. LLC*, No. CV 12-04358 MMM

18  (FMOx), 2013 WL 10156242, at *9 (C.D. Cal. Jan. 22, 2013) (quoting *Porten v. Univ. of San*

19  *Francisco*, 64 Cal. App. 3d 825, 828 (1976)).  "Even if they place the person in a less than

20  flattering light, the published facts are not actionable if they are true or accurate." *Id.* (citing

21  *Fellows*, 42 Cal.3d at 238).  In addition, California courts construe the "false light" cause of action

22  as a substantive equivalent to libel, and therefore requires proof of malice.  *See Aisenson v. Am.*

23  *Broad. Co.*, 220 Cal. App. 3d 146, 161 (1990) (citing *Briscoe v. Reader's Digest Assoc., Inc.*, 4

24  Cal.3d 529, 543 (1971)).

25           Here, the FAC includes factual allegations about Rogers falsely reporting that Plaintiffs'

26  horses were starving and malnourished and were stripping trees of bark to feed themselves

27  because Plaintiffs did not provide them enough feed, and that she posted information about the

28  case against Plaintiffs on the Chronicle of the Horse online bulletin board.  (Dkt. No. 46 ¶¶ 18,

*United States District Court*
*Northern District of California*

31

37.)  The FAC includes allegations that Wagman "caused untrue statements to be published concerning the Burnells" in the Chronicle of the Horse, RateMyHorsePro.com, and a magazine called The Horse and that Ricci made "false and/or malicious reports to [Rogers] regarding Jill Burnell, her mental health, business, horses and person that were intended to and did cause embarrassment, and other personal and commercial injury."  (*Id.* ¶¶ 19, 22.)  The FAC further alleges that Machado has "falsely stated that Jill Burnell is in 'violation' of the terms of her probation.  (*Id.* ¶¶ 13, 69.)  McKenney is alleged to have "caused the facts of the Marin Humane Society investigation of [Plaintiffs] and fundraising for the Marin Humane Society to be misrepresented to the public[[.]"  (*Id.* ¶ 12.)

In the claim itself, Plaintiffs allege that "Defendants caused dissemination of information that may be false or erroneous, placed Plaintiffs in a derogatory and false light; and that would be offensive to a reasonable person."  (Dkt. No. 46 ¶ 100.)  Plaintiffs do not identify the particular false statements disclosed, explain how or to whom the disclosure occurred such that the Court can determine whether there was publication, allege facts demonstrating the falsity of the statement, identify which disclosure was made by each defendant, or allege malice.  Incorporating by reference the 42 pages of factual allegations into this claim is not enough.  The claim is dismissed with prejudice as to Defendants Ricci and Ghilotti, as there are no factual allegations that they engaged in any publicity; instead, the FAC alleges that they made reports to Rogers, which is not "publicity."  *See Porten*, 64 Cal. App. 3d at 828; *Mnatsakanyan*, 2013 WL 10156242, at *9 (citation omitted).  However, because the other Defendants are alleged to have reported information about Plaintiffs to the public or on the internet, the false light invasion of privacy claim against them is dismissed with leave to amend to cure the deficiencies outlined above.

> d.   *Sixth Cause of Action: Public Disclosure of Private Facts / Invasion of Constitutional Right to Privacy*

Relatedly, Plaintiffs' sixth cause of action against the Marin Humane Society, McKenney, Machado, Rogers, Ricci, Ghilotti, and Wagman is for public disclosure of private facts and/or invasion of their right to privacy under the California constitution.  Public disclosure of private facts is another version of the tort of invasion of privacy.  *See Shulman v. Grp. W Prods., Inc.*, 18

32

1    Cal.4th 200, 214 n.4 (1998).  The elements of a claim for public disclosure of private facts are "(1)

2    public disclosure, (2) of a private fact, (3) which would be offensive and objectionable to the

3    reasonable person, and (4) which is not of legitimate public concern." *Taus v. Loftus*, 40 Cal.4th

4    683, 717 (2007) (quotation marks and citation omitted); *see also Opperman v. Path, Inc.*, 87 F.

5    Supp. 3d 1018, 1061-62 (N.D. Cal. 2014).  "[T]here can be no privacy with respect to a matter that

6    is already public or which has previously become part of the public domain." *Daly v. Viacom,*

7    *Inc.*, 238 F. Supp. 2d 1118, 1124 (N.D. Cal. 2002) (citing *Sipple v. Chronicle Publ'g Co.*, 54 Cal.

8    Ap. 3d 1040, 1045 (1984).  Just as with false light claims, public disclosure means

9    "communicating [the information] to the public at large, or to so many persons that the matter

10   must be regarding as substantially certain to become one of public knowledge." *Hernandez v.*

11   *Path, Inc.*, No. 12-CV-01515 YGR, 2012 WL 5194120, at *6 (N.D. Cal. Oct. 19, 2012) (citing

12   Cal. Jury Instr.-Civ. 7.21); *see also Kinsey v. Macur*, 107 Cal. App. 3d 265, 271 (1980).

13          Here, Plaintiffs allege generally that "Defendants caused the dissemination of private facts

14   concerning Plaintiffs, their home, and business about which they had a reasonable expectation that

15   intimate images would not be disseminated publicly" and the disclosure "was one that would be

16   offensive to reasonable persons[.]"  (Dkt. No. 46 ¶¶ 103-104.)  Plaintiffs have not identified which

17   defendant made a public disclosure of which private facts, so the Court is not in a position to

18   assess whether the disclosure would be offensive and objectionable to the reasonable person nor

19   whether the matter is not of legitimate public interest.  Plaintiffs' conclusory allegations of these

20   elements is not enough to state a claim.  As with the false light cause of action, this claim is

21   dismissed with prejudice as to Defendants Ricci and Ghilotti, as there are no factual allegations

22   that they engaged in any publicity; instead, the FAC alleges that they made reports to Rogers

23   about Plaintiffs' horses, home and business.  With respect to the other defendants, the FAC as

24   written fails to state a claim because it does not identify the particular statement, make clear that

25   the information was private, or—in some instances—provide facts in support of publication.  For

26   example, while allegations that Rogers published information on online blogs suffices to establish

27   publication, the conclusory allegation that McKenney publicly shared information does not.

28   Plaintiff must support this conclusory allegation with facts.  Accordingly, Plaintiff's public

United States District Court
Northern District of California

33

1   disclosure of private facts cause of action is dismissed with prejudice as to Ricci and Ghilotti and

2   with leave to amend as to the other Defendants.

3          e.      *Seventh Cause of Action: Intentional and/or Negligent Infliction of
                   Emotional Distress*

4

5          Lastly, the seventh cause of action against all Defendants except the County is for

6   intentional and/or negligent infliction of emotional distress.  To plead a claim for intentional

7   infliction of emotional distress ("IIED"), a plaintiff must allege facts sufficient to plausibly

8   establish the following elements: (1) extreme and outrageous conduct by the defendant with the

9   intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the

10  plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation

11  of the emotional distress by the defendant's outrageous conduct.  *Potter v. Firestone Tire &*

12  *Rubber Co.*, 6 Cal. 4th 965, 1001 (1993) (internal quotation marks omitted); *see also Hughes v.*

13  *Pair*, 46 Cal. 4th. 1035, 1050 (2009; *Austin v. Terhune*, 367 F.3d 1167, 1172 (9th Cir. 2004).

14  Conduct is "outrageous" if it is "so extreme as to exceed all bounds of that usually tolerated in a

15  civilized community."  *Potter*, 6 Cal. 4th at 1001.

16         Plaintiffs' IIED cause of action is inadequately pleaded.  Plaintiffs allege that "Defendants'

17  conduct caused them to suffer severe emotional distress[,]" that their conduct was "extreme as to

18  exceed all bounds of that usually tolerated in a civilized community" and that Defendants intended

19  to cause or acted with reckless disregard of the probability of causing Plaintiffs severe emotional

20  distress.  (Dkt. No. 46 ¶¶ 109-111.)  Merely parroting the elements of an IIED cause of action is

21  not enough to state a claim under *Twombly* and *Iqbal*.  Plaintiffs otherwise fail to identify what

22  conduct purportedly gives rise to this cause of action, fails to indicate which Defendants engaged

23  in which outrageous conduct, and is absent any facts pertaining to the nature and extent of

24  Plaintiffs' emotional or mental suffering.  The claim therefore fails.

25         Plaintiffs' negligent infliction of emotional distress ("NIED") claim fares no better.  First,

26  NIED similarly requires factual allegations that demonstrate that the plaintiff actually suffered

27  serious emotional distress proximately caused by the defendant's wrongful conduct, *see Austin*,

28  367 F.3d at 1172, and the FAC contains no such facts.  Moreover, despite similar wording, unlike

United States District Court
Northern District of California

34

United States District Court
Northern District of California

the intentional formulation, NIED "is a form of the tort of negligence, to which the elements of duty, breach of duty, causation and damages apply." *Huggins v. Longs Drug Stores Cal., Inc.*, 6 Cal. 4th 124, 129 (1993). The duty element "may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship." *Potter*, 6 Cal. 4th at 985; *see also Raynal v. Nat'l Audubon Soc'y, Inc.*, No. 11-cv-05599 NC, 2012 WL 5878386, at *14 (N.D. Cal. Nov. 21, 2012) (citations omitted). Here, Plaintiffs do not allege facts that plausibly establish how all defendants except the County owed Plaintiffs a duty of care. In addition, "where the conduct is intentional, it cannot be used as the basis for a negligent infliction of emotional distress claim." *Edwards v. U.S. Fidelity & Guar. Co.*, 848 F. Supp. 1460, 1466 (N.D. Cal. 1994), *aff'd*, 74 F.3d 1245 (9th Cir. 1996). Thus, although Plaintiffs appear to allege that the same conduct gives rise to both intentional *and* negligent infliction of emotional distress, such cannot be the case. *See id.* For each of these reasons, Plaintiffs' seventh cause of action fails to state a claim against any defendant and is therefore dismissed with leave to amend.

\* \* \*

In short, Plaintiffs' fifth, sixth, and seventh causes of action for portrayal in a false light, invasion of privacy, and infliction of emotional distress are all inadequately pleaded and are therefore dismissed. The privacy torts are dismissed with prejudice as to Ricci and Ghilotti and without prejudice as to the remaining Defendants. The emotional distress cause of action is dismissed without prejudice. If Plaintiffs choose to amend these claims, they should be parsimonious in choosing which Defendants to include in each cause of action, naming only those Defendants whose conduct Plaintiff can specifically identify as meeting the elements of the claim.

In addition, buried in Plaintiffs' opposition is a request to amend the FAC to add additional state-law causes of action alleging interference contract, defamation, fraud, and malicious prosecution. (Dkt. No. 55 at 7.) Of course, this request does not suffice as a formal motion for leave to amend and ordinarily the Court would not consider it. However, as the Court will allow Plaintiffs leave to amend their already-asserted state law claims, they may have leave to amend to add additional state law claims arising out of the same incidents, as well. Plaintiffs are cautioned that any newly added claims must comply with the pleading standards set forth above.

3.    Preclusion

The California Superior Court is now reviewing the administrative decision upholding the seizure as lawful.  The potential preclusive effect of the state court proceedings looms large.

The Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."  U.S. Const. art. IV, § 1.  To effectuate this provision and extend its reach to the federal courts, Congress enacted 28 U.S.C. § 1738, which provides that the "Acts, records, and judicial proceedings" of "any State . . . of the United States . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such state . . . from which they are taken." Section 1738 requires that federal courts "give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *White v. City of Pasadena*, 671 F.3d 918, 926 (9th Cir. 2012) (citing *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 81 (1984)).  Accordingly, because this case involves prior actions in California state courts and administrative bodies, the Court applies California law on preclusion.

Issue preclusion "precludes relitigation of issues argued and decided in prior proceedings." *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 896 (2002) (internal quotation marks and citation omitted).   "The doctrine applies only if the decision in the initial proceeding was final and on the merits and the issue sought to be precluded from relitigation is identical to that decided in the first action and was actually and necessarily decided in that action." *Lucido v. Super. Ct.*, 51 Cal. 3d 335, 341 (1990).  In addition, the party against whom preclusion is sought must be the same as, or in privity with, the party to the first action. *Id.*  In other words, even where the second cause of action is not barred by claim preclusion, judgment in an earlier case can "operate[ ] as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action" between the same parties. *Branson v. Sun-Diamond Growers*, 24 Cal. App. 4th 327, 345 (1994) (citation omitted); *see also Johnson v. City of Loma Linda*, 24 Cal. 4th 61, 78 (2000) (listing the elements of issue preclusion as "identity of issues, finality of the decision, and identity or privity of the party against whom estoppel is sought"); *Segal v. AT&T Co.*, 606 F.2d 842, 845 (9th Cir. 1979).  Here, the hearing officer decided the Marin Humane

36

Society's seizure of Plaintiffs' horses was lawful. (*See* Dkt. No. 48-5 ¶ 11 (concluding that the Marin Humane Society officers "reasonably believed that very prompt action was necessary to protect the health and safety" of the seized horses such that the seizures were legally justified under California Penal Code Section 597.1").) This same issue is a necessary element of Plaintiffs' Section 1983 claim that the Marin Humane Society and its employees violated Plaintiffs' Fourth Amendment rights by unlawfully seizing their horses. That the issue is now reframed as an element of a federal civil rights claim is of no matter. *See Miller*, 39 F.3d at 1034. Thus, the issue is the same and was actually litigated and determined in the same action between at least some of the same parties.

Issue preclusion may operate as a bar to litigation of an issue decided in an earlier administrative proceeding. *See B&B Hardware, Inc. v. Hargis Indus., Inc.*, 134 S. Ct. 1293, 1303 (2015) ("[W]here a single issue is before a court and an administrative agency, preclusion often applies."). Section 1738, discussed above, applies where administrative findings have been reviewed by state courts of general jurisdiction. *Einheber v. Regents of Univ. of Cal.*, 266 F. App'x 596, 599 (9th Cir. 2008) (citing *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 326-27 (9th Cir. 1995)). But here, Section 1738 cannot yet apply because there is no state court decision reviewing the hearing officer's May 2015 decision; in other words, the administrative decision is not yet final.

*Clemes v. Del Norte County Unified School District*, No. C-93-1912 MHP, 1995 WL 573691, (N.D. Cal. Sept. 19, 1995), is instructive. There, a plaintiff brought a Section 1983 claim arising out of his termination from employment. *Id.* at *1-2. The plaintiff's claims initially proceeded to a hearing before a state administrative body, the Commission on Professional Competence, which decided to terminate the plaintiff's employment. *Id.* Thereafter, when the plaintiff filed suit in federal court, the defendants contended that issue preclusion barred relitigation of the propriety of plaintiff's termination. *Id.* at *4. The district court held that the plaintiff's pending mandamus petition prohibited issue preclusion for lack of finality. *Id.* at *5 ("[I]t is premature to apply collateral estoppel to the instant case because the Commission's decision is not final.") (citing *Long Beach Unif. Sch. Dist. v. State of Cal.*, 225 Cal. App. 3d 155,

United States District Court
Northern District of California

37

168-69 (1990)).  Accordingly, the court stayed the federal case pending resolution of the state

court proceedings.  *Id.* at *6.  Although *Clemes* involved a case at a later stage of litigation—

specifically, the parties had filed motions for summary judgment—this Court sees no reason to

depart from the *Clemes* court's reasoned and logical approach to the procedural problem of a

parallel mandamus petition and federal court action challenging the same action.

Plaintiffs' reliance on *Wabakken v. California Department of Correction and

Rehabilitation*, 801 F.3d 1143 (9th Cir. 2015), is unavailing.  There, the plaintiff appealed his

termination to the California State Personnel Board, where his termination was largely upheld in

an administrative hearing.  *Id.* at 1145.  The plaintiff then filed suit in federal court challenging the

same termination under the California Whistleblowers Protection Act.  Relying on a case from the

California Supreme Court, the *Wabakken* court held that the unique statutory structure of that Act

meant that the administrative decision did not preclude later litigation; in particular, the Act

provided that an employee could bring a separate action for damages notwithstanding the ruling of

the administrative body.  *Id.* at 1148-49.  *Wabakken* is plainly distinguishable as Plaintiff has not

identified any language in the seizure statute suggesting that issue preclusion should not apply to

an administrative decision upholding the seizure's lawfulness.

Thus, a final decision from the California courts upholding the lawfulness of the seizure of

Plaintiffs' horses will likely be fatal to Plaintiffs' Section 1983 Fourth Amendment claim, the only

federal claim now potentially remaining in this lawsuit.  Accordingly, a stay of this action is

appropriate pending resolution of Plaintiffs' petition for writ of mandate in state court.  At oral

argument, Plaintiffs agreed that such a stay is warranted, and requested that this case be stayed in

its entirety—including the deadline to file an amended complaint—pending resolution of the state

court proceedings.

### III.     The County's Motion to Dismiss

The only claim Plaintiffs allege against the County is a Section 1983 claim.  The County is

plainly a state actor acting under the color of law for the purposes of a Section 1983 claim.  As for

the violation of a constitutional right, in the FAC, Plaintiffs did not set forth the basis of the claim

against the County.  At oral argument, however, Plaintiffs represented that the County has a duty

38

1  not to have Marin Humane Society employees pretend to be peace officers, which the County is

2  violating by allowing the agency to act without a *certified* humane officer.  Put another way,

3  Plaintiffs contend that the County's ordinance allowing Marin Humane Society officers to enforce

4  all state laws regarding animal control conflicts with other state laws that require certification

5  before individuals may act as peace officers.  According to Plaintiffs, this policy is a violation of

6  their due process right to have state actors act lawfully.

7       Plaintiffs have not been able to identify any authority holding that a county ordinance or

8  regulation granting officer status to certain agency actors violates a citizen's rights to due process.

9  Notably, even if they had, they would not have shown that this violation was the moving force

10  behind Plaintiffs' constitutional violation, since the humane society officers brought a County

11  Sheriff's deputy with them on both occasions when the horses were seized.  Plainly a Sheriff's

12  deputy is a certified peace officer authorized by law, if not local ordinance, to effect seizures of

13  property.  Thus, the claim against the County is dismissed with prejudice.

### CONCLUSION

15       For the reasons described above, the Court DENIES Defendant Burnham's motion for

16  entry of judgment, GRANTS IN PART Defendants' motion to dismiss, and GRANTS the

17  County's separate motion to dismiss.  The Section 1983 claims predicated on violations of the

18  First, Fifth, and Eighth Amendments are dismissed with prejudice.  The Section 1983 claims

19  against Defendants Wagman, Ricci, Ghilotti, Keefer, McKenney and the County are dismissed

20  with prejudice.  The fifth and sixth causes of action for invasion of privacy torts are dismissed

21  with prejudice as to Ricci and Ghilotti and without prejudice as to the remaining Defendants.  The

22  seventh cause of action for intentional and/or negligent infliction of emotional distress is

23  dismissed without prejudice.

24       The Court hereby STAYS this action pending resolution of Plaintiffs' state court

25  proceedings.  The parties shall file a joint status report within 30 days of the Superior Court's

26  decision on Plaintiff's petition for writ of mandate.  As this action is stayed in its entirety,

27  Plaintiffs need not file a second amended complaint until further order of the Court.

28

United States District Court
Northern District of California

1

United States District Court
Northern District of California

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This Order disposes of Docket Nos. 47, 49, and 50.

**IT IS SO ORDERED.**

Dated: November 5, 2015

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

40